UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Community Stabilization Project,

Plaintiff,

v.

Andrew M. Cuomo, in his official capacity as Secretary of the Department of Housing and Urban Development; the United States Department of Housing and Urban Development; City of St. Paul; Carey Apartments Limited Partnership; and Firstar Trust Co.,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 00-1761 ADM/SRN

---

John Cann, Esq., Timothy Thompson, Esq., and Ann M. Norton, Esq., St. Paul, Minnesota, appeared for and on behalf of the Plaintiff.

Eric D. Larson, Esq., Assistant City Attorney for St. Paul, Minnesota, Friedrich Siekert, Esq., Assistant United States Attorney, Minneapolis, Minnesota, and Charles Bethel, II, Esq., St. Paul, Minnesota, appeared for and on behalf of the Defendants.

---

## I. INTRODUCTION

On January 26, 2001, the undersigned United States District Judge heard Defendants' Motions to Dismiss [Doc. Nos. 15, 18, 27] for, *inter alia*,[1] lack of standing under Article III of the U.S. Constitution, and failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6). Plaintiff seeks injunctive relief from the sale and demolition of the Carey Apartments, and a declaratory judgment requiring the owner of Carey Apartments to continue making units available to low income persons in need of affordable rental housing. *See* Compl.,

[1] Because the alternative grounds discussed below are sufficient, the additional grounds for dismissal argued by Defendants are not reached.

FILED FEB 2 6 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD 2001
DEPUTY CLERK

¶¶ 46-56. For the reasons set forth below, Defendants' Motion to Dismiss is granted.

## II. BACKGROUND

This dispute takes place in the context of the Minneapolis-St. Paul metropolitan area's scarce rental housing market. The vacancy rate in the metropolitan area is approximately 1.3%. Royce Aff. ¶ 6. This severe shortage of rental housing has a particularly adverse impact on persons with low incomes. The rental housing crisis is due to both the metropolitan area's failure to develop new rental units and its loss of existing affordable rental units.

The Community Stabilization Project (the "CSP") is a nonprofit organization whose mission is "to foster and preserve affordable rental housing for its clients and members, particularly minorities." Mem. in Opp., at 5. The CSP has a staff of three full-time persons and approximately 50-75 active members, who agree to support the goals of the CSP and participate in its work. Royce Aff. ¶¶ 2, 4. The CSP accomplishes its organizational mission through variety of programs aimed at increasing the number of affordable housing units and making existing housing more habitable. *Id.* ¶ 3. Two members of the CSP inquired about renting units at Carey Apartments and were told that the owner was not renting the units. *Id.* ¶ 17. The CSP then brought this action on behalf of itself and its members.

Carey Apartments is an 11-unit apartment project, consisting of two adjacent buildings, located at 1086 and 1090 Iglehart Avenue in St. Paul, Minnesota. Hanson Aff. ¶¶ 8-9. Carey Apartments Limited Partnership (the "Owner") currently owns the apartment project. *Id.* On September 23, 1969, the United States Department of Housing and Urban Development

("HUD")[2] endorsed the secured note on Carey Apartments, which was issued by a private mortgagee ("Mortgagee") in 1969 and carries a below market interest rate of 3% per annum. *See* Siekert Aff., Ex. 1. The note was secured by a mortgage. *Id.*, Ex. 2. HUD insured the mortgage pursuant to section 221(d)(3) of the National Housing Act ("NHA"), 12 U.S.C. § 1715l(d)(3). *Id.*

As part of the 1969 mortgage transaction, the Owner entered into a Regulatory Agreement with HUD. Siekert Aff., Ex. 3. The Regulatory Agreement remains in effect, *inter alia*, "so long as the contract of mortgage insurance continues in effect, and during such further period of time as [HUD] shall be the owner . . . of the mortgage . . . or during any time [HUD] is obligated to insure a mortgage on the mortgaged property." *Id.* at 1. The Regulatory Agreement provides that so long as the mortgage insurance provided by HUD remains in force, the property will be used only as a residence for low income persons, the rents to be charged will be subject to limitations, and all compensation and distributions to the Owner will be limited to a cap of 6% per annum on their initial equity investment. *See id.* ¶¶ 4(a), 4(b), 6(c). The Regulatory Agreement further provides that the "Owners shall not without prior written approval of [HUD] convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer, or encumbrance of such property." *Id.* ¶ 6(a).

The secured note established a prepayment restriction:

> The debt evidenced by this note may not be prepaid either in whole or in part prior to the final maturity date hereof without the prior written approval of [HUD]

---

[2] Defendants will remain as listed in the caption--Andrew M. Cuomo, in his official capacity as the former Secretary of the Department of Housing and Urban Development, and the United States Department of Housing and Urban Development will be referred to as "HUD."

> except [Owner][3] may prepay without such approval after 20 years from the date of final endorsement of this note by [HUD].

Siekert Aff., Ex. 3. This secured note provision allows Owner to prepay the mortgage without HUD approval any time after 20 years from September 23, 1969.

In 1990, the Mortgagee exercised its right, pursuant to section 221(g)(4)(A) of the NHA, to assign the note and mortgage to HUD in exchange for the insurance proceeds to which it would be entitled at that time, provided that at the end of the twenty years the mortgage was not in default. *See* 12 U.S.C. § 1715l(g)(4)(A). On November 5, 1990, under an amendment to the NHA adding new section 221(g)(4)(C), HUD received the statutory authority to conduct auctions of mortgage loans in the hands of mortgagees who would otherwise be eligible to assign them to HUD. *See* 12 U.S.C. § 1715l(g)(4)(C). On October 25, 1994, HUD held an auction of mortgage loans, including the Carey Apartments mortgage, that previously had been assigned to it under section 221(g)(4)(A). As a result, the Carey Apartments mortgage was transferred to a new mortgagee. This change did not effect Owner's rights because the mortgage was transferred under the same terms that applied to the original 1969 transaction, with the exception that Owner now was required to make its mortgage payments to the new mortgagee.

In May of 1999, Owner entered into a contract with the City of St. Paul (the "City") to sell Carey Apartments to the City. *See* Novak Aff., Ex. A. In June of 1999, ten of the eleven units in Carey Apartments were occupied. Hanson Aff. ¶¶ 9,11. In the following months, the City assisted in relocating all but one of the tenants. *Id.* ¶¶ 11-12. The tenth was evicted by Owner. *Id.* The City provided the nine relocated tenants with replacement housing assistance

---

[3] Owner is a "limited distribution mortgagor" as defined in the HUD Housing Handbook 4010.1, ¶¶ 1-48.

subsidies and moving expenses pursuant to 49 C.F.R. § 24.402(b). *Id.* ¶¶ 15, 20. These payments were calculated to be the difference between the tenant's monthly rent at Carey Apartments and the monthly rent the relocated tenant would be required to pay for similar housing in a different location over a period of 42 months, plus a moving allowance. *Id.* The Carey Apartments units are currently vacant and none of the former tenants have expressed an interest in returning. *Id.* ¶ 12.

The City plans to use the real estate upon which Carey Apartments is located for an expansion of the Jimmy Lee Recreation Center located at 1063 Iglehart Avenue, St. Paul, Minnesota. *See* Wittgenstein Aff. ¶¶ 3-4, Ex. A. The St. Paul City Council has approved the Recreation Center expansion because it is a public benefit for all community members, many of whom are low and moderate income families and individuals who live in the area. *Id.* ¶9.

## III. DISCUSSION

### A. Standing

The threshold question that must be addressed is a jurisdictional one: whether the CSP has standing under Article III of the Constitution to maintain this suit. *See Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 93-102 (1998). Article III, § 2, of the Constitution extends the "judicial Power" of the United States only to "Cases" and "Controversies." *Id.* at 102. In order to establish Article III standing, a plaintiff must meet three requirements. *See, e.g.*, *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000). The "triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co.*, 523 U.S. at 103-04.

Therefore, the CSP first must demonstrate "injury in fact"--a harm that is both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (internal citations omitted). Second, the CSP must establish causation--a "fairly traceable" connection between the alleged injury in fact and the alleged conduct of the defendants. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976). Third, the CSP must demonstrate redressability--a "substantial likelihood" that the requested relief will remedy the alleged injury in fact. *Id.* at 45. These three requirements constitute the "irreducible constitutional minimum" of standing, which is an "essential and unchanging part" of Article III's case-or-controversy requirement, and a key factor in dividing the power of government between the courts and the two political branches. *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 120 S.Ct. 1858, 1861-62 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992)). In deciding this motion to dismiss, the CSP's allegations must be accepted as true and the complaint must be construed in the CSP's favor. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) (stating that a court may allow a plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing).

Here, the CSP argues that it is entitled to declaratory and injunctive relief because the planned sale and demolition of Carey Apartments will disproportionately deprive minority persons of affordable housing in violation of 42 U.S.C. § 3604. *See* Compl. ¶¶ 49-51. The CSP further claims judicial relief as a result of HUD's determination that 12 U.S.C. § 1701a-11(k)(1) does not require HUD to restrict prepayment of the Carey Apartments mortgage and prevent the sale of Carey Apartments to the City. *See* Compl. ¶¶ 52-56. However, "[t]he Article III judicial

power exists only to redress or otherwise to protect against injury to the complaining party." *Warth*, 422 U.S. at 499; *see also Sierra Club v. Morton*, 405 U.S. 727, 734-735 (1972). To meet the injury-in-fact requirement, the party seeking relief must be itself among the injured. *See Lujan*, 504 U.S. at 560. "[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth*, 422 U.S. at 499. The CSP has failed to show that it "sustained or is immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct and [that] the injury or threat of injury [is] both real and immediate . . . ." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations omitted). The CSP has not demonstrated how it in particular will be injured by the sale and demolition of Carey Apartments or HUD's refusal to change the terms of the 1969 transaction allowing prepayment of the mortgage after 20 years.

Although the CSP alleges a concrete injury to its activities and diminution of its resources, the facts of this case are inapposite to those of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In *Havens*, a realty company and one of its employees were alleged to have engaged in discriminatory "steering" in violation of the Fair Housing Act of 1968, specifically 42 U.S.C. § 3604(d), which conferred on all persons a legal right to truthful information about available housing. *Id.* at 367-69. The plaintiffs included a housing organization whose mission was making equal opportunity housing a reality. *Id.* The defendant organization owned two apartment complexes and was accused of "steering" potential black renters to an integrated complex and away from a complex predominately occupied by white renters. Conversely, potential white renters were told that the predominately white complex had vacancies. *Id.* The

plaintiff organization alleged that it had suffered injury as a result of the defendant's discriminatory "steering" practices, claiming that its counseling and referral services had been frustrated by the "steering," draining its resources as a consequence. *Id.* The Supreme Court held that the plaintiff organization had institutional standing because it alleged that defendant's racial steering practices frustrated "its efforts to assist equal access to housing through counseling and other referral services." *Havens*, 455 U.S. at 379.

In contrast, the CSP has not alleged that it was provided with false information that hindered its ability to pursue its mission or caused any direct injury to itself. Unlike the situation in *Havens*, the CSP makes no allegation that any of the Defendants misrepresented any facts in violation of the law and thereby injured its efforts to preserve affordable rental housing. The distinguishing facts of this case do not confer standing within the dictates of the *Havens* decision. Without a showing of injury in fact, the CSP does not have standing. *See Arkansas ACORN Fair Housing, Inc. v. Greystone Ltd. Corp.*, 160 F.3d 433, 435 (8th Cir. 1998) (holding that absent specific facts establishing "distinct and palpable injuries fairly traceable" to the defendant's actions, plaintiff cannot establish the injury in fact requirement for standing under the FHA).

Contrary to the CSP's assertions, *215 Alliance v. Cuomo*, 61 F. Supp.2d 879 (D. Minn. 1999), does not bestow standing on the CSP in this case. In *215 Alliance*, the CSP[4] alleged injury out of the loss of housing units as a result of HUD's failure to use inadequate notice[5] as an

---

[4] In the *215 Alliance* case, the CSP was a co-plaintiff along with the 215 Alliance, which was an organization of tenants residing in the apartment complex at issue, and a named individual tenant. *215 Alliance*, 61 F. Supp.2d at 881.

[5] Owners were required to give notice one year prior to terminating housing assistance subsidies. 42 U.S.C. § 1437f(c)(9).

affirmative defense against termination of the housing assistance payment contracts and prepayment of the mortgage. *Id.* at 884. The *215 Alliance* court found that the inadequate notice injured the CSP because it was forced to "face the mad scramble to protect the interests of low-income tenants . . . ." *Id.* Unlike *215 Alliance*, in the instant case there are no tenants who received inadequate notice of the termination of any housing assistance payment contract. More apropos to this case, in *215 Alliance* the owner's right to prepay the mortgage was undisputed. *See infra*, § III (B).

Any alleged interest in the costs of litigation and attorney's fees is insufficient to confer standing on the CSP. "The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Association of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999); *accord Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990). "An interest in attorney's fees [in an action] is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Steel Co.*, 523 U.S. at 107 (internal citations omitted).

In sum, the CSP's generalized concern about the sale and demolition of Carey Apartments, while related to its laudable but abstract social interest in affordable rental housing, does not create injury in fact sufficient to confer standing. The injury in fact requirement helps ensure that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). "Suits

that promise no concrete benefit to the plaintiff, and that are brought to have us 'determine questions of law *in thesi*,' [*Marye v. Parsons*, 114 U.S. 325, 328-329 (1885)], are most often inspired by the psychological smart of perceived official injustice, or by the government-policy preferences of political activists." *Steel Co.*, 523 U.S. at 104. The doctrine of standing ensures that a true "case" or "controversy" is presented to the court.

The CSP next avers that it has standing pursuant to the associational standing doctrine. Three criteria are prerequisites to the application of this doctrine. An organization may have associational standing to bring suit on behalf of its members if (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n.*, 432 U.S. 333, 343 (1977).

The CSP meets the second prong of the associational standing test because the CSP's purpose is germane to its mission regarding affordable rental housing. The CSP does not meet the first prong, however. Assuming that former Carey Apartments tenants are members of the CSP, the former tenants would not have standing to sue in their own right because there is no injury in fact to redress. Each former Carey Apartments tenant who was relocated received replacement housing assistance subsidies and moving expenses. Furthermore, the redressability requirement is not met because the former tenants are all residing elsewhere and have been compensated for their relocation. *See Carson v. Pierce*, 719 F.2d 931, 933 (8th Cir. 1983) (holding that associational plaintiff did not have standing to sue for declaratory relief or an injunction because it had not demonstrated that any of its individual members would have

standing to sue in their own right, where the individuals no longer resided in the defendant's apartments and did not allege that they wished return to the apartments).

The CSP also fails to meet the third prong. To meet standing requirements for associational standing, the participation of individual members of the organization must not be required. *Hunt*, 432 U.S. at 343. Here, both the existence and extent of injury requires individualized proof. The CSP requests declaratory and injunctive relief because the Carey Apartment residents were displaced without receiving Section 8[6] housing assistance vouchers. *See* Compl. ¶¶ 46-47. Generally, the Section 8 voucher program requires a family to pay approximately 30% of its adjusted monthly income toward rent. *See* 42 U.S.C. § 1437f(t), (o)(2). An award of Section 8 vouchers requires a determination of the income of the recipient, the recipient's family composition, the suitability and quality of the recipient's current residence, the rent charged to the recipient at that location, and the utility rates at that residence. *See* 24 C.F.R. §§ 887.351-887.363. None of that information may be obtained without the participation of individual members of the CSP, the potential voucher recipients, in this lawsuit. *See Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467, 471 (8th Cir. 1985) (holding that associational standing is properly denied where the need for "individualized proof" so pervades the claims asserted that the furtherance of the members' interests requires individual representation). The CSP fails to meet the requirements for associational standing.

---

[6] The United States Housing Act of 1937, § 8(f), provides for the distribution of "enhanced voucher assistance" to families who are residing in an assisted housing project at the time of an "eligibility event." 42 U.S.C. § 1437f(t). The term "eligibility event" includes the prepayment of certain HUD-insured mortgages. *Id.* § 1437f(t)(2).

**B. Failure to State a Claim**[7]

A complaint is properly dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Kaylor v. Fields*, 661 F.2d 1177, 1180-81 (8th Cir. 1981) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The CSP rests its complaint on an alleged violation of rights under 12 U.S.C. § 1701z-11(k)(1) and HUD's failure to enforce the FHA as required by 42 U.S.C. § 3608. Specifically, the CSP avers that upon the mortgage sale in 1994, HUD should have ensured that the Carey Apartments continued to operate as low-income housing until the maturity of the 40-year loan.

In the 1969 transaction, the secured note, mortgage, and regulatory agreement granted Owner the right to prepay the secured note at the end of a 20-year period from the date of endorsement. Thus, after September 23, 1989, Owner has the right to prepay. Once the Owner has paid the mortgage, the Regulatory Agreement and HUD's authority to regulate the project are extinguished.

The language of 12 U.S.C. § 1701z-11(k)(1) provides that no mortgage sale should result in any subsidized project operating on terms less favorable to the existing and future tenants than it did prior to the sale. This statute requires HUD to ensure that an owner continues to provide housing on terms at least as advantageous to existing and future tenants as the terms required by the program under which the mortgage was created or insured prior to the sale. 12 U.S.C. § 1701z-11(k)(1). The legislative history of the Housing and Community Development Act of 1987, which amended the NHA and added § 1701z-11(k), states that "in developing these

[7] This section assumes, *arguendo*, that the CSP does have standing.

provisions every attempt was made to balance the contract rights of owners with the need to try to preserve the existing stock of housing for low income persons." H.R. Rep. No. 100-122(I), at 37 (1987). The language and history of § 1701z-11(k)(1) make clear that a mortgage sale cannot result in contract terms less favorable to tenants, but it does not dictate terms more favorable to tenants at the expense of owners' contractual rights.

The terms of the 1969 Carey Apartments transaction provided Owner with the right to prepay the mortgage after 20 years. The Owner's rights are no greater now. HUD's 1994 sale of the mortgage did not change the terms of the original deal, for better or worse. Because the contractual terms remain the same, HUD complied with the requirements of § 1701z-11(k)(1). The CSP offers no authority for this Court to alter the Owner's contractual right to prepay the mortgage.

To the extent that the CSP challenges any other of HUD's enforcement decisions, they are non-reviewable by a court under *Heckler v. Cheney*, 470 U.S. 821 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss [Doc. Nos. 15, 18, 27] are **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Dated: February 27, 2001

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd